# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 20, 2007

Charles R. Fulbruge III
Clerk

No. 06-20575

JOHNNY B. CRAWFORD, ORLANDO EDGERSON,
BERNARD GARRETT, DERRELL HOPSON,
ARTHUR HYPOLITE, LOUELLA NIMROD,
WILLIE PRATT

Plaintiffs-Appellants

v.

CITY OF HOUSTON TEXAS

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:04-CV-04555

Before HIGGINBOTHAM, WIENER, and GARZA, Circuit Judges.

PER CURIAM:[*]

Johnny Crawford, Orlando Edgerson, Bernard Garrett, Derrell Hopson, Arthur Hypolite, Louella Nimrod, and Willie Pratt (Plaintiffs) brought suit against the City of Houston alleging racial discrimination in violation of 42 U.S.C. §§ 1981 and 1983. The City moved for summary judgment, which the district court granted. Plaintiffs appealed. We affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I

In November 2000, Plaintiffs, all of whom are African Americans, were employed as Community Service Inspectors in the City's Department of Public Works and Engineering, Neighborhood Protection Division (the Department). On November 8, the Department sought applicants to fill three openings as Senior Inspectors. All Plaintiffs applied for promotion to Senior Inspector; however, none was selected.

Human Resources initially screened all of the applications. The applications that met the position's minimum qualifications were passed on to the Department. The Department utilized screening committees to review the applications and interview candidates. Jennifer Wylie and Angela Dotson, both African American females, and Elmo Day, a white male, were each recommended by a screening committee as its top choice for one of the open positions. Barbara Jones, a white female, and Lee Pipes, a white male, comprised the committee that recommended Day. The recommendations were first reviewed by Todd Cooper, a white male, before being forwarded to Deputy Director Beatrice Link, a black female. Link reviewed the recommended candidates and approved all three. Subsequently, Link learned of recent criminal misconduct by Wylie; she withdrew her selection of Wylie and asked the screening committee that had recommended Wylie to refer another applicant. The screening committee recommended Herbert Williams, an African American male; Link approved Williams.

Plaintiffs sued the City alleging discrimination in the promotion of Day to the Senior Inspector position. Plaintiffs initially brought a Title VII action against the City; however, it was dismissed for failure to exhaust administrative remedies. Plaintiffs then filed the present suit, alleging violations under 42 U.S.C. § 1981; Plaintiffs amended their complaint to allege violations under 42 U.S.C. §§ 1981 and 1983. Plaintiffs allege that Day was less qualified than they

and did not meet the job's minimum qualifications. They argue that he was hired because of an affirmative action policy that had a goal of hiring white males to correct for under-representation of whites in the Department. Plaintiffs foot their argument that there was such a policy on the annual affirmative action reports that the Department prepared for the City's Affirmative Action Advisory Commission. The reports described, inter alia, the racial makeup of the Department's employees, and, most important in this case, included charts labeled "employment goals." The 1999 report, for example, has two tables discussing the Department's "goals." Under the percentage goals, the report lists approximately twenty percent for whites and is blank for African Americans,[1] and for raw numbers lists eighteen for whites and zero for African Americans. The City denies that there was any policy to give whites a preference, urging instead that these were mere responsive reports and that the reports were never adopted as official City policy.

The City moved for summary judgment arguing that the statute of limitations had run; Plaintiffs could not prove a violation of § 1981; and Plaintiffs could not prove the elements for municipality liability under § 1983. The district court held that the action was not time barred, but it granted the City's motion on the latter two points. Plaintiffs filed this appeal.

II

We review de novo the district court's decision to grant summary judgment.[2] Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[3]

---

[1] The photocopy of the report in the record is difficult to read. The percentage for white males appears to be 20.8 %, but from this copy we cannot be certain. In any event, the exact percentage is not dispositive.

[2] Terrebonne Parish Sch. Bd. v. Mobil Oil Corp., 310 F.3d 870, 877 (5th Cir. 2002).

[3] Fed. R. Civ. P. 56(c).

We view all of the evidence and draw all inferences in the light most favorable to the nonmoving party, "and all reasonable doubts about the facts should be resolved in favor of the nonmoving party."[4] "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."[5] "Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment."[6]

## III

To establish a violation of § 1981 a plaintiff must prove (1) he is a member of a protected class; (2) there was an intent to discriminate on that basis; and (3) the discrimination concerned one or more of the activities in the statute.[7] Although § 1981 speaks of the right to "make and enforce contracts," an employer's failure to promote is actionable under the statute.[8] Section 1981 race discrimination claims are analyzed under the McDonnell Douglas framework.[9]

Section 1981 does not itself create a cause of action against a municipality; rather, a plaintiff complaining of a municipality's violations of § 1981 must

---

[4] Terrebonne Parish Sch. Bd., 310 F.3d at 877.

[5] Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003).

[6] Lechuga v. S. Pac. Transp. Co., 949 F.2d 790, 798 (5th Cir. 1992).

[7] Felton v. Polles, 315 F.3d 470, 483 (5th Cir. 2002); Green v. State Bar of Tex., 27 F.3d 1083, 1086 (5th Cir. 1994).

[8] Police Ass'n of New Orleans v. City of New Orleans, 100 F.3d 1159, 1170 (5th Cir. 1996).

[9] Price v. Fed. Express Corp., 283 F.3d 715, 719-20 (5th Cir. 2002); Pratt v. City of Houston, 247 F.3d 601, 606 & nn. 1, 2 (5th Cir. 2001); see McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

assert his claims via § 1983.[10]  In doing so, the plaintiff "cannot proceed under a theory of respondeat superior and must instead satisfy the 'custom or policy' test fashioned for suits against a municipality under § 1983."[11]  This "requires proof of three elements in addition to the underlying claim of a violation of rights: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."[12]  The final element requires the plaintiff to prove causation; that is, that the policy or custom is the cause in fact of the rights violation.[13]

We conclude that Plaintiffs failed to offer evidence from which a reasonable jury could find that the City's alleged affirmative action policy served as the "moving force" behind the decision to promote Day instead of one of the Plaintiffs.  We therefore do not address whether the district court correctly applied the McDonnell Douglas framework, nor is it necessary for us to decide whether Plaintiffs offered sufficient evidence to create a fact question over the existence of an official policy or custom.

The district court found that

> Plaintiffs have not shown that the Affirmative Action Program Report actually played a role in the decision to promote Elmo Day. Plaintiffs have presented no evidence that the members of the

---

[10] Felton, 315 F.3d at 481-82; Oden v. Oktibbeha County, Miss., 246 F.3d 458, 463-64 (5th Cir. 2001).

[11] Evans v. City of Houston, 246 F.3d 344, 358 (5th Cir. 2001).

[12] Cox v. City of Dallas, 430 F.3d 734, 748 (5th Cir. 2005) (quoting Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001)) (internal quotation marks omitted).

[13] We described the "moving force" element in Fraire v. City of Arlington, 957 F.2d 1268, 1281 (5th Cir. 1992), a § 1983 excessive police force case, as requiring that "a direct causal connection must exist between the policy and the alleged constitutional deprivation.  This connection must be more than a mere 'but for' coupling between cause and effect.  To form the basis of liability under § 1983, a municipal policy must be affirmatively linked to the constitutional violation and be the moving force behind it."  See also City of Canton v. Harris, 489 U.S. 378, 391 (1989); Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force, 379 F.3d 293, 310 (5th Cir. 2004); Rheuark v. Shaw, 628 F.2d 297, 305 (5th Cir. 1980).

[screening] committee . . . or any other person involved in the promotion decisions . . . had any knowledge of the Affirmative Action Program Report or the goals set forth therein.[14]

Plaintiffs' counsel conceded as much at oral argument. Asked if there was evidence in the record demonstrating that those who promoted Day knew of the affirmative action reports, counsel responded:

> Not that I'm aware of, but since we had never received like an adequate justification or production of evidence as to what [the City's] reason for hiring Mr. Day was, we didn't have the opportunity to get that evidence. . . . As far as I know, there is no evidence in the record—

Counsel then qualified his statement, admitting that both Link and Cooper had given depositions; in other words, Plaintiffs had the opportunity to develop their knowledge of the affirmative action reports.

As discussed below, the record is devoid of evidence indicating that those who promoted Day knew of the reports. Counsel is incorrect in suggesting that Plaintiffs' responsibility for proving causation turns on the City articulating or proving its reasons for promoting Day. Proving that a policy or custom was a moving force in the violation is a prerequisite, free-standing requirement for a plaintiff's pursuing municipal liability under § 1983.

Plaintiffs' briefs do not directly address the moving-force requirement or the district court's ruling on that point. We read their briefs as pointing to the following evidence that Day was promoted in accordance with the reports: the interview process was discriminatory toward African American applicants, in particular because of the "surprise" skills test and writing sample requirement; Day had advanced knowledge of the test; the City "lost" screening committee interview notes; Day received more favorable treatment than Wylie, an African American applicant; and Day was less qualified than Plaintiffs.

---

[14] Crawford et al. v. City of Houston, No. 4:04-CV-04555 (S.D. Tex. May 24, 2006).

All of the evidence proffered by Plaintiffs in this case suffers from the defect identified by the district judge: none of it establishes that those responsible for promoting Day knew of the affirmative action reports, let alone the purported employment goals contained therein. Knowledge of the reports is antecedent to acting on the reports; logically, the reports cannot have been the moving force in the decision to promote Day if those responsible did not know of the reports' existence. Furthermore, the individual pieces of evidence suffer from particularized defects, dissipating any inference of knowledge of the reports on the part of those who promoted Day.

That the job posting failed to disclose that a skills test or evaluation would be given favors no person or group. Anyone reading the posting and preparing for the job would be equally "surprised"; and, while some of the questions were technical, the test itself was neutral and the questions were related to the job.[15]

There is no competent evidence that Day received advanced warning of the skills test and writing sample requirement. The only evidence indicating that he did are Hypolite's and Pratt's declarations. Both declarations state – verbatim – that "[s]hortly before the interviews, I observed Elmo Day in private conferences with Todd Cooper and Lee Pipes, and Barbara Jones discussing the interview and selection process." The declarations are entirely conclusory and conjectural; neither declaration describes the contents of the conversation nor even alleges that Hypolite or Pratt could hear what was being said.

Evidence regarding the missing notes is relevant only to the extent that the notes were "lost" to cover up something. That the notes are missing and that

---

[15] Questions included: "How have you directly or indirectly prepared yourself for this position?"; "What is the purpose of and procedures for [the Family Medical Leave Act]?"; "Compare and contrast the Administrative Hearing and the Building and Standards Commission hearing process."

the EEOC found this to be a Title VII record keeping violation[16] may, standing alone, give rise to an inference of a bad act; but, without more, they are not probative of whether those who promoted Day knew of the reports.

The allegation that Day received more favorable treatment than Wylie is not helpful either. Day had been convicted for misdemeanor assault in 1996, while Wylie's difficulties surfaced during the interview process. Link withdrew Wylie's recommendation for promotion, but not Day's. This, Plaintiffs say, shows discrimination.

However, Plaintiffs fail to account for the factual differences. Both Link and Cooper testified in their depositions that the Office of the Inspector General (OIG) contacted Link after she had approved Wylie for the promotion. According to Cooper, the OIG explained that Wylie's criminal issues involved "some misrepresentation involving an ATM card and that there was a pending trial." Link testified that Wylie had been charged for theft on City time. As Cooper explained, "Link and the inspector general's office and H&R felt like [Wylie] would not be a good candidate . . . ." There was no evidence that the OIG or "H&R" had similar misgivings about Day and his misdemeanor assault conviction. Moreover, there is a timing difference: Day's conviction was on his application for Human Resources to review during the initial screening process, while Wylie's criminal problems did not arise until well after the initial screening. And, because Wylie's problems came to light after the screening panels and Cooper reviewed her application, there can be no suggestion that they treated Day and Wylie differently. The difference in treatment Day and

---

[16] See 29 C.F.R. § 1602.14 ("Any personnel or employment record made or kept by an employer (including but not necessarily limited to . . . application forms submitted by applicants and other records having to do with hiring [or] promotion . . .) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later.").

Wylie received did not have its genesis within the Department's promotion process, belying any inference that it resulted from the reports.

Plaintiffs' oft-made allegation that Day was less qualified suffers the same infirmity as the other evidence: on its own, his being less qualified says nothing of whether those who picked him did so in conformity with the reports. Indeed, it does not overcome Plaintiffs' threshold problem: whether those who picked Day even knew of the reports.

The most substantial evidence concerning the affirmative action reports was the deposition testimony of Thomas Rolen, the then-Director of the Department. Rolen testified that the reports were prepared by Herb Fain, whom he indicated was the Deputy Director in personnel. Rolen explained that he reviewed the reports, signed the transmittal letter, and returned the reports to Fain to transmit to the City's Affirmative Action Council. Rolen gave no indication that the reports were distributed within the Department; Link testified that she did not know of the reports, and both Cooper and Link testified that they had never been told of any policy favoring white applicants.

Rolen did state that the reports were provided to Human Resources, the department that initially screened the applications to ensure that they met the minimum qualifications. However, the potential exposure of Human Resources to the reports does not advance Plaintiffs' claim: all of Plaintiffs were approved in the initial screening. That is, at the only point in the promotion process where the record supports an inference that a decisionmaker could have been exposed to the reports,[17] the reports caused Plaintiffs no harm; they, along with Day and everyone else who applied, moved to the next round.

---

[17] Even that is a circumstantial inference as there was no testimony that the reports were generally distributed in Human Resources, or that the person in Human Resources who reviewed these particular senior inspector applications had seen the reports.

Nor does Rolen's or Fain's exposure to the reports advance Plaintiffs' cause, as there is no evidence indicating that they were involved in the decision to promote Day. Rolen testified that it was the people under him who made the hiring and promotion decisions. Day was selected and approved by Link before Fain and those in personnel became involved. The testimony clearly establishes that the persons involved in selecting Day over Plaintiffs were the members of the Department's screening panels, Cooper, and Link.[18]

The only evidence indicating that the alleged affirmative action policy was a moving force in the decision to promote Day are the conclusory, speculative statements of Plaintiffs themselves.[19] In the absence of any corroborative evidence, the subjective beliefs and conjecture of Plaintiffs are not enough to create a genuine issue of material fact.[20]

IV

As Plaintiffs introduced no direct evidence, or evidence giving rise to an inference, that those who selected Day knew of, let alone acted on, the purported discriminatory policy, they cannot establish § 1983 municipal liability and consequently cannot prevail on their § 1981 claim. AFFIRMED.

---

[18] The parties dispute at which point in the Department's promotion process the decision to hire Day was made – that is, who among the screening panels, Cooper, and Link actually made the decision. Because of the lack of evidence indicating that any of them knew of the affirmative action reports, this dispute is of no moment.

[19] For example: "I think [they] were following the policy, discriminatory policy" (Hopson deposition); "I do understand why it was going on because of that document about that they was underrepresented by white males" (Pratt deposition); "The only thing I can tell you is the fact that, you know, a less qualified white applicant was given preference in this hiring situation in accordance with the affirmative action memo that the Public Works Department came up with" (Edgerson deposition); "Mr. Cooper, along with the other interviewers, they were probably I would say acting on the affirmative action report" (Nimrod deposition).

[20] See Waggoner v. City of Garland, Tex., 987 F.2d 1160, 1164 (5th Cir. 1993) ("We have held that a plaintiff's subjective belief that his discharge was based on age is simply insufficient to establish an ADEA claim.").